UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
Carolina Acoustical and         )    Case No. 05-13236C-7G
Flooring, Inc., f/d/b/a         )
The Tile Shop,                  )
                                )
        Debtor.                 )
_____ )
                                )
Charles M. Ivey, III, Trustee   )
for Carolina Acoustical and     )
Flooring, Inc., f/d/b/a         )
The Tile Shop,                  )
                                )
        Plaintiff,              )
                                )
v.                              )    Adversary No. 07-2032
                                )
Hunter Acquisitions, Inc.,      )
                                )
        Defendant.              )
                                )

MEMORANDUM OPINION

This adversary proceeding came before the court on January 21,

2009, for trial.  John M. Blust appeared on behalf of the plaintiff

and Emily J. Meister and Amiel J. Rossabi appeared on behalf of the

defendant.  Having received and considered the evidence offered at

the trial and the arguments presented on behalf of the parties, the

court makes the following findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure and

Rule 7052 of the Federal Rules of Bankruptcy Procedure.

JURISDICTION

The court has jurisdiction over the subject matter of this

proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the

General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.

NATURE OF CONTROVERSY

This proceeding involves a suit by the plaintiff as chapter 7 trustee for Carolina Acoustical & Flooring, Inc. ("debtor") to recover on two promissory notes issued by the defendant, one in the principal sum of $30,000 and the other in the principal sum of $50,000. Both notes arose out of the defendant's purchase of the assets of the debtor in July of 2004.

The defendant admits the issuance of the two promissory notes, but denies any liability on the notes on the grounds that defendant is entitled to a complete setoff based upon indemnity provisions contained in the purchase agreement between the debtor and the defendant.

Defendant's indemnification claim is based upon debtor's failure to pay its vendors and a business broker following the closing as allegedly required under the purchase agreement. The damages alleged by the defendant include a $50,000 settlement with the broker and attorneys' fees incurred by the debtor in defending against the claims asserted by the broker. The defendant contends that the purchase agreement obligated the debtor to indemnify the defendant as to the settlement payment, the attorneys' fees and certain other damages allegedly incurred by the defendant, and that the defendant is entitled to setoff the entire amount due under the

two promissory notes against the debtor's obligation to indemnify
the defendant.

FACTS

Prior to the events giving rise to this proceeding, the debtor
operated a business located in Greensboro, North Carolina, known as
the Tile Shop, which involved the sale and installation of various
types of flooring.  In June of 2003, the debtor entered into a
Listing Agreement for Sole and Exclusive Right to Sell ("Listing
Agreement") with VR Business Brokers ("VR") under which the debtor
engaged VR "to broker the sale, lease, trade or other disposition
of all or any part" of the assets of the debtor.  Under the listing
agreement, the debtor agreed to pay VR the greater of 12% of the
selling price or $50,000 if, during the term of the listing
agreement, VR procured a purchaser ready, willing and able to
purchase assets of the debtor on the terms specified in the listing
agreement.  Following the execution of the Listing Agreement, VR
began efforts to find a buyer for debtor's business.  These efforts
included listing the debtor on an internet website maintained by
VR.

In early 2004, the defendant had become interested in the
flooring business and was exploring various alternatives for
getting into that business.  One of the alternatives under
consideration was the purchase of an existing business.  At some
point prior to July of 2004, the defendant accessed VR's website

- 3 -

and learned that one of VR's listings was the debtor's flooring business. The defendant contacted VR in order to obtain more information regarding the debtor. Discussions ensued between representatives of the defendant and representative of VR during which information regarding the debtor's business and assets was provided by VR. These discussions were followed by direct discussions between the defendant and the debtor during which the parties began to negotiate regarding a purchase of the debtor's assets by the defendant.

After several weeks of negotiations, the defendant and the debtor signed an asset purchase agreement on July 9, 2004, under which the debtor agreed to sell all of its inventory, equipment, contracts, records, and two motor vehicles to the defendant for a purchase price of $330,000. As a part of the transaction, the defendant also agreed to pay the debtor the sum of $50,000 over a period of 36 months as consideration for a consulting agreement under which the debtor would be available for consulting services following the closing.

Following the execution of the asset purchase agreement, a closing was held on July 9, 2004. After a $165.38 adjustment for the defendant's share of ad valorem taxes, the balance due on the purchase price was $329,834.62, which was further reduced by payments totaling $157,552.11 which were disbursed directly to creditors of the debtor who held liens that encumbered the

purchased assets, leaving the net amount of $172,282.51 payable to the debtor.  From that amount the debtor made a loan of $30,000 to the defendant with the result that the debtor received a check for $142,282.31 plus a promissory note for $30,000 evidencing the loan extended to the defendant.  The debtor also received a promissory note for $50,000 as consideration for the consulting agreement called for under the asset purchase agreement.

One result of the negotiations that preceded the execution of the asset purchase agreement was that the price to be paid for the debtor's assets was reduced substantially below the initial asking price of $590,000 specified in the listing agreement.  Apparently, as a result of this reduction and also dissatisfaction on the part of the debtor regarding VR's performance, VR and the debtor were still discussing a possible reduction in VR's fee when the sale closed.  As a consequence, VR was not paid a fee at the closing. Although a number of vendors were paid by the debtor following the closing, VR also was not paid at that time, apparently as a result of the continuing disagreement regarding the amount of VR's fee. Although VR apparently was willing to accept a fee of $48,000, which was less than the $50,000 minimum provided for in the listing agreement, the debtor contended that the fee should be less than $48,000.  When no agreement was reached and no payment was made, VR filed suit against both the debtor and the defendant in January of 2005 seeking to recover a fee of $48,000, plus interest and

attorneys' fees.  The claims asserted against the debtor were for breach of the listing agreement and quantum meruit.  The claims against the defendant alleged a violation of the North Carolina statutes dealing with bulk transfers, N.C. Gen. Stat. §§ 25-6-101, et. seq., and an allegation that the transfer of the debtor's assets to the defendant constituted a fraudulent transfer.

On September 28, 2005, the debtor commenced a chapter 7 proceeding in this court.  Thereafter, VR voluntarily dismissed the civil action which was still pending when the debtor filed its chapter 7 petition.  Following the dismissal of the first action, VR filed a second action in the Superior Court of Guilford County on February 3, 2006.

In the second action, VR sued the defendant as well as the principals in the defendant, Britt C. Holcomb and Stacy D. Holcomb. The complaint in the second action contained twelve claims for relief and sought recovery of the $48,000 broker's fee plus compensatory damages in excess of $10,000, interest and attorneys' fees, punitive damages and treble damages.  The defendant and the Holcombs filed an answer in the second civil action denying liability.  In September of 2007, shortly before the second action was scheduled to be tried, the parties entered into a settlement in which VR received a cash payment of $50,000 and gave a general release to the defendants in the second action.

ANALYSIS

The plaintiff established a prima facie case for recovery on the $30,000 and $50,000 promissory notes by offering the defendant's admissions that it issued and delivered the promissory notes and that no payments have been made on the promissory notes. This left the defendant with the burden of establishing its setoff defense. For the reasons that follow, the court has concluded that the setoff defense has been established by the defendant.

If a right of setoff exists under applicable state law, then section 553 of the Bankruptcy Code preserves the "right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . ." 11 U.S.C. § 553. Thus, in order to exercise a right of setoff under section 553, there are four conditions that must exist: (1) the creditor must hold a "claim" against the debtor that arose before the commencement of the case; (2) the creditor must owe a "debt" to the debtor that also arose before the commencement of the case; (3) the claim and debt must be "mutual"; and (4) the claim and debt each must be valid and enforceable. 5 <u>Collier on Bankruptcy</u> ¶ 553.01[1] (15th ed. rev. 2008). The party asserting setoff must show that setoff is available under applicable state law, as well as each of the requirements under section 553. <u>In re Krause</u>, 261 B.R. 218,

- 7 -

222 (8th Cir. BAP 2001); <u>In re Camellia Food Stores, Inc.</u>, 287 B.R. 52, 59 (Bankr. E.D. Va. 2002)(citing numerous cases).

    1.  Is setoff available under applicable nonbankruptcy law?

Where, as in the present proceeding, a party relies upon state law as the basis for setoff, "the general rule is that the existence of the right, as well as the nature and essential validity of the obligations sought to be offset, will be determined in accordance with the law of the place where the operative facts transpired." 5 <u>Collier on Bankruptcy</u> ¶ 553.04, p. 553-61. This means that North Carolina law is applicable in this proceeding since all of the operative facts transpired in North Carolina.

North Carolina has long recognized the right of setoff where mutual debts exist between parties. <u>Durham v. SMI Indus. Corp.</u>, 882 F.2d 881, 883 (4th Cir. 1989). The requirements for setoff under North Carolina law are mutuality of parties and of claims. <u>In re Battery King Mfg. Co., Inc.</u>, 83 S.E.2d 490, 492 (N.C. 1954)(setoff available where there is "mutuality of parties and of demands"); <u>In re Bank of Sampson</u>, 171 S.E. 436, 436 (N.C. 1933)(setoff available where "both claims exist between the same parties and in the same right"). Under North Carolina law, setoff is available when "each party owns his own claim in his own right severally with the right to collect it in his own right and severally." <u>In re Britton</u>, 83 B.R. 914, 918 (Bankr. E.D.N.C. 1988)(summarizing North Carolina law). The reference in the North

Carolina cases to owning the claim "severally" distinguishes a debt solely owned by a party from a debt owned jointly with another party and ordinarily would preclude a setoff if one claim was owned jointly and the opposing claim was owned severally.    Id.

In this proceeding, both the debtor and the defendant own their own claim in their own right severally with the right to collect it in their own right and severally, which means that the claims are the type of claims that may be used to effect a setoff. In order to utilize setoff to nullify the indebtedness held by the plaintiff, however, the defendant must also establish that the requirements of section 553 have been met.

    2. Has defendant established the requirements
       under section 553?

This inquiry requires a consideration of the four requirements imposed under section 553 for the exercise of setoff.

        a.   Does defendant hold a claim that arose
             before commencement of the debtor's case?

This requirement actually consists of two elements.  First, the creditor must have a "claim" and, second, the claim must have arisen before the commencement of the debtor's bankruptcy case.  As explained below, the court finds that both of these elements are established by the evidence.

The definition contained in section 101(5) of the Bankruptcy Code is applicable in determining whether a creditor has a "claim." A "claim" is defined in section 101(5) as any "right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . ."  The existence of a claim under this definition does not depend upon the ultimate validity and allowability of the claim.   Under this extremely broad definition, the defendant has a "claim" against the debtor in that the defendant asserts a breach of contract by the debtor and resulting monetary damages.

Whether the defendant's claim arose before the commencement of the debtor's bankruptcy case is disputed by the plaintiff.   The plaintiff argued that since the defendant paid the settlement to the broker and incurred the attorneys' fees included in its claim after the commencement of the debtor's case, the claim should be considered a post-commencement claim rather than pre-commencement. This argument is not accepted.   In the Fourth Circuit, the applicable test for determining whether a claim arose before the commencement of a bankruptcy case is when the conduct occurred that created or gave rise to the claim.  Grady v. A.H. Robins Co. (In re A.H. Robins Co.), 839 F.2d 198 (4th Cir. 1988); In re Camellia Food Stores, Inc., 287 B.R. 52, 57 n.2 (Bankr. E.D. Va. 2002). Accordingly, if the conduct or transaction giving rise to the claim occurred before the petition was filed, then the claim arose before the commencement of the case even though the claim may be contingent or unliquidated when the petition is filed.  See Braniff

- 10 -

Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1036 (5th Cir. 1987)("The character of a claim is not transformed from pre-petition to postpetition simply because it is contingent, unliquidated, or unmatured when the debtor's petition is filed."); Employees' Retirement Sys. v. Osborne (In re THC), 686 F.2d 799 (9th Cir. 1982); L.R. Rothschild & Co. v. Angier, 84 B.R. 274 (D. Mass. 1988); In re Thompson, 182 B.R. 140, 152-53 (Bankr. E.D. Va. 1995); Simpson v. Phalen (In re Phalen), 145 B.R. 551 (Bankr. N.D. Ohio 1992).

In the present proceeding, the contract in which the defendant agreed to pay the broker and which contained the agreement to indemnify the defendant was entered into prior to the commencement of debtor's bankruptcy case. The alleged breach of the contract giving rise to defendant's claim occurred when the debtor failed to pay the broker, which also occurred before the commencement of the bankruptcy case, as did the first lawsuit in which the defendant was sued by the broker. Under these circumstances, the defendant had a claim for breach of contract and for indemnification when the debtor's case was commenced even though the claim was contingent and unliquidated at that time. These circumstances are determinative of whether defendant's claim arose pre-commencement, rather than when the attorneys' fees and payment to the broker were actually incurred and the claim thereby rendered non-contingent and liquidated. See Abercrombie v. Hayden Corp. (In re Abercrombie),

- 11 -

139 F.3d 755 (9th Cir. 1998).

> b.  Does defendant owe a debt that arose before commencement of the debtor's case?

This requirement also has two elements which consist of the creditor owing a debt and such debt having arisen before the commencement of the debtor's case.  Both of these elements have been established.  It is admitted by the defendant that both of the promissory notes referred to in the plaintiff's complaint were executed by the defendant when the debtor's assets were transferred to the defendant.  It likewise is admitted by the defendant that nothing has been paid on either promissory note.  Clearly, the plaintiff has a claim based upon the promissory notes, which gives rise to a debt on the part of the defendant.  5 Collier on Bankruptcy ¶ 553.03[2][a] (15th ed. rev. 2008)("As a general rule, an obligation that would constitute a proper prepetition claim under section 553 if asserted by a creditor will likewise constitute a proper prepetition debt if asserted by the debtor."). It likewise  is clear that such debt arose before the commencement of the debtor's case when the promissory notes were executed and delivered by the defendant.

> c.  Are the claim and debt mutual?

As a general rule, mutuality under section 553 requires that the debts be owed between the same parties acting in the same capacity.  In re Koch, 224 B.R. 572, 576 (Bankr. E.D. Va. 1998). "This simply means that the creditor is indebted to the debtor who

- 12 -

is similarly indebted to the creditor." Id. Many of the cases also include as a general rule that the claim and debt must be owed in the same "right." See 5 Collier on Bankruptcy ¶ 553.03[3][d] (15th ed. rev. 2008). This requirement "simply enforces the rule that joint obligations are not subject to setoff against separate debts in bankruptcy." Id. Where, as in the present proceeding, only two parties are involved with respect to both the claim and the debt and each of parties is acting severally and in its own right, the mutuality requirement of section 553 is easily met.

     d.  Are the claim and debt valid and enforceable?

A claim or debt may be utilized to effect a setoff pursuant to section 553 only to the extent that it is valid and enforceable under applicable nonbankruptcy law and allowable under the Bankruptcy Code. 5 Collier on Bankruptcy ¶ 553.03[4] (15th ed. rev. 2008). This means that if the claim or debt is disputed, an examination of the merits of the claim or debt is required. See Conono Inc. v. Styler (In re Peterson Distrib., Inc.), 82 F.3d 956, 963-64 (10th Cir. 1996)(creditor was permitted to setoff only the amount of the invoices that had been submitted to and accepted by creditor according to its contract with debtor because only accepted invoices represented valid and enforceable debts owed by the creditor to the debtor); Rowan v. Morgan (In re Rowan), 15 B.R. 834, 840 (Bankr. N.D. Ohio 1981)(Social Security Administration could not setoff amount of overpayments received by the debtor

- 13 -

against future payments to debtor because, when the bankruptcy case was commenced, the Administration did not owe the debtor anything), aff'd, 747 F.2d 1052 (6th Cir. 1984). Since the defendant's claim is disputed by the plaintiff, the merits of the defendant's claim must be examined.

The defendant's claim is based upon indemnification provisions contained in the Asset Purchase Agreement ("Purchase Agreement"). The defendant asserts that the debtor owed and should have paid a broker's fee to VR and that under the indemnity provisions of the Purchase Agreement the debtor is indebted to the defendant for the $50,000 paid to VR as well as the attorney fees incurred by the defendant as the result of the debtor's failure to do so.

North Carolina recognizes and will enforce contracts of indemnity under which the indemnitor agrees to indemnify the indemnitee with respect to liability that may be incurred by the indemnitee to a third party. E.g., New Amsterdam Cas. Co. v. Waller, 64 S.E.2d 826 (N.C. 1951). Such agreements typically are invoked when the third party later sues the indemnitee and the indemnitee is adjudged to be liable to the third party after a trial or other court proceeding. Indemnification, however, is not limited to instances in which a judgment is entered against the indemnitee. An indemnitee is not required to expose itself to the risk and expense of a trial in order to preserve its rights under an indemnity agreement. See Bridgestone/Firestone, Inc. v. Ogden

- 14 -

Plant Maint. Co. Of N.C., 548 S.E.2d 807, 812 (N.C. App. 2001).
Indemnity may be available if the indemnitee is able to show that
the settlement was reasonable and the indemnitee was not a mere
volunteer.  Id.

Ordinarily, to establish a right to indemnification where a
case is resolved by settlement, the indemnitee must establish that
the underlying claim was valid against it, that the claim is within
the coverage of the indemnity agreement, that the settlement was
for a reasonable amount, and that any counsel fees sought by the
indemnitee also are reasonable.  41 Am Jur Indemnity § 27 (2005).
Since the defendant's indemnity claim is derived from a settlement
rather than a judgment, the foregoing are the elements that the
defendant was required to prove in order to sustain its claim for
reimbursement of the $50,000 paid to VR.

(i) Validity of the Underlying Claim.

The underlying claim that the defendant was required to
establish as valid was VR's claim that the defendant was liable for
VR's fee.  In doing so, the defendant was required to prove the
validity of only one of the several theories of liability asserted
by VR.  The claim that the defendant was able to uphold was VR's
claim that the defendant was liable to VR under the North Carolina
bulk transfer statutes.  Whether the defendant was liable or
potentially liable pursuant to VR's claim depends upon whether the
bulk transfer statutes were applicable to the transaction in which

- 15 -

the defendant acquired the debtor's assets and, if so, whether VR was entitled to recover from the defendant under the bulk transfer statutes.   The evidence established the applicability of North Carolina's bulk transfer statutes as well as a strong likelihood that the defendant could have been held liable under such statutes for the broker's fee owed to VR.

The bulk transfer statutes relied upon by VR were contained in Article 6 of the Uniform Commercial Code, N.C. Gen. Stat. §§ 25-6-101, et. seq.  Although thereafter repealed, these statutes were in effect on July 9, 2004, when the debtor's assets were transferred to the defendant.[1]  Since the debtor's principal business was the sale of flooring materials from stock, the debtor was subject to Article 6.[2]  Since the sale to the defendant included all of the debtor's inventory and all of its equipment and was not made in the ordinary course of business, the  July 9, 2004 sale to the defendant was a "bulk transfer" for purposes of Article 6.[3]  This

---

[1]Article 6 of Chapter 25 of the General Statutes was repealed by Session Laws 2004-190, s. 1, effective January 1, 2005.  Session Laws 2004-190, s. 1, provides that rights and obligations arising under Article 6 of Chapter 25, and former N.C. Gen. Stat. § 25-6-111 before January 1, 2005, remain valid and may be enforced as though such statutes had not been repealed.

[2]Under N.C. Gen. Stat. § 25-6-102(3), the enterprises subject to Article 6 were "all those whose principal business is the sale of merchandise from stock, including those who manufacture what they sell."

[3]Under N.C. Gen. Stat. § 25-6-102(1), a "bulk transfer" is "any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies,

means that the defendant, as transferee, was required to comply with N.C. Gen. Stat. §§ 25-6-104 and 107.   The defendant was required by section 25-6-104 to obtain from the debtor a list of the debtor's existing creditors and was required by section 25-6-107 to give notice to all creditors on such list by mailing or personally delivering a notice of the type described in section 25-6-106 at least ten days before the closing on July 9, 2004.   It is undisputed that the defendant did not comply with either of these requirements.   This brought into play section 25-6-105 which provides that "any bulk transfer subject to this article except one made by auction sale is ineffective against any creditor of the transferor unless at least ten days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons hereinafter provided."

The result of a bulk transfer being "ineffective" is that creditors "may disregard the transfer and levy on the goods as though they still belonged to the transferor."   North Carolina Comment to N.C. Gen. Stat. § 25-6-105.   Most courts, however, have not limited creditors to <u>in rem</u> relief against the assets that were transferred without complying with Article 6.   A majority of courts

---

merchandise or other inventory of an enterprise subject to this article."   Under N.C. Gen. Stat. § 25-6-101(2), a transfer of a substantial part of the equipment of an enterprise subject to Article 6 is a "bulk transfer" if it is made in connection with a bulk transfer of inventory.

have held that where the assets have been sold, disposed of or commingled by the transferee, recovery of damages is available as a remedy against a transferee who failed to comply with Article 6. In re Villa Roel, Inc., 57 B.R. 835, 839 (Bankr. D.C. 1985)("Case law, however, establishes damages as an appropriate remedy where as here, the items transferred have since been sold, disposed of and converted. . . . The amount of damages should equal the value of the items transferred on the date of the transfer. . . ."). Accord Ex Parte Harsco Corp., 689 So.2d 845 (Ala. 1997); Coastal Oil New England, Inc. v. Citizens Fuels Corp., 644 N.E.2d 258 (Mass. App. Ct. 1995); Streamlight, Inc. v. Int'l Health & Safety Corp. (In re Streamlight, Inc.), 108 B.R. 505 (Bankr. E.D. Pa. 1989). Contra Crosswell Enterprises, Inc. v. Arnold, 422 S.E.2d 157 (S.C. App. 1992). It appears from the limited North Carolina authority involving Article 6 that North Carolina would follow the rule that damages may be recovered if the transferred assets are no longer available or cannot be identified. See Collins v. Talley, 553 S.E.2d 101, 102 (N.C. App. 2001)("Article 6 does not establish any tort liability against the transferee nor does it give the creditor the right to recover from the transferee personally on the transferor's debt unless the transferred property has become so commingled with the transferee's other property so as to be untraceable." (emphasis supplied)).

- 18 -

The parties who are protected by section 25-6-105 and have the right to assert a claim against the transferee are the persons or entities who have valid claims against the transferor at the time of the bulk transfer. See N.C. Gen. Stat. § 25-6-109. This means that VR would be entitled to recover from the defendant under the bulk transfer statutes only if VR's claim against the debtor was valid and enforceable. Thus, the next step in evaluating the validity of VR's claim against the defendant is determining whether VR's claim against the debtor was supported by the evidence. This inquiry must be answered in the affirmative.

The execution of the Listing Agreement by the debtor is undisputed. Under the terms of the Listing Agreement the debtor agreed to pay the fee specified in the agreement if, during the exclusive period specified in the agreement, VR procured a purchaser ready, willing and able to purchaser the debtor's assets or if, during the two years following the exclusive period, the debtor sold its assets to any person or entity who became aware of the availability of the debtor through the efforts of VR during the exclusive period. The evidence established that during the exclusive period the defendant learned of the availability of the debtor through VR's website and that the defendant's initial contact regarding a possible acquisition was with representatives of VR, as were the early discussions regarding a possible purchase by the defendant. The evidence also established that the sale that

closed on July 9, 2004, was within two years following the end of the exclusive period on June 30, 2004.  Thus, when the sale to the defendant closed on July 9, 2004, VR was entitled under the terms of the Listing Agreement to receive the fee provided in the Listing Agreement.  Although the debtor apparently became dissatisfied with the performance of VR and took over the negotiations that ultimately led to the Purchase Agreement, there was no showing of any breach of the Listing Agreement by VR or other circumstance that deprived VR of its entitlement to a broker's fee on July 9, 2004.

Since the evidence established the applicability of the bulk transfer statutes, the defendant's non-compliance with such statutes and that VR was a creditor at the time of the bulk transfer, the validity of VR's claim against the defendant was established.  See Cinocco Realty, Inc. v. J.L.J., Inc., 736 P.2d 421 (Colo. Ct. App. 1987)(broker who has a claim against transferor is a creditor as to whom a bulk transfer is ineffective).  And VR's right to assert a claim under the bulk transfer statutes existed without regard to whether it had actual knowledge of the transfer of assets to the defendant.  See Dublin v. UCR, Inc., 444 S.E.2d 455 (N.C. App. 1994);  Cleaners Products Supply, Inc. v. Garcia, 629 N.Y.S.2d 647 (1995); Cinocco Realty, Inc. v. J.L.J., Inc., supra; Goodyear Tire & Rubber Co. v. Tabs, Inc., 26 U.C.C. Rep. Serv. 1290 (Conn. Super. Ct. 1979).

(ii)  Is VR's Claim within the Coverage
      Of the Indemnity Agreement?

The indemnity provisions relied upon by the defendant are contained in paragraphs 12 and 21 of the Purchase Agreement executed by the defendant and the debtor.  Paragraph 12 deals specifically with broker's fees and contains an acknowledgment by the debtor that it was obligated to VR Business Brokers and an agreement to indemnify the defendant from any liability for any broker's commissions relating to the transaction.[4]  Paragraph 21 is entitled "Hold Harmless Agreement" and provides that the debtor agrees to indemnify and hold the defendant harmless from and against any and all claims and costs and expenses, including attorney fees, imposed upon or incurred by or asserted against the defendant by reason of a breach of any representation, warranty or covenant of the debtor contained in the agreement or by reason of any liability or claim "arising out of or relating to any acts, omissions, events, conditions, occurrences, or circumstances of any nature caused by Seller. . . ."  The claim by VR and the settlement and attorneys' fees related to the VR claim clearly fall within

---

[4] Paragraph 12 of purchase agreement provides:

> Broker's Fees.   Seller and Reynolds acknowledge that Seller is obligated to VR Business Brokers, that Purchaser has no liability for any broker's commissions relating to this transaction, and Seller and Reynolds will indemnify Purchaser from any liability therefor.

- 21 -

these provisions.

Paragraph 12 specifically provides that the defendant "will indemnify" the defendant from any liability to VR.  The settlement of a suit against the defendant in which there was a strong likelihood that VR would prevail constitutes "liability" to VR and falls within the debtor's undertaking in paragraph 12.  Moreover, having acknowledged in paragraph 12 that it was obligated to VR, the failure to pay VR was a breach of the debtor's covenant in paragraph 16[5] to pay the fees and expenses that it incurred in connection with the sale and conveyance of the assets and brings into play paragraph 21 of the Asset Purchase Agreement. Paragraph 21 obligates the debtor to indemnify the defendant with respect to, _inter alia_, attorneys' fees arising out of any act or omission of the debtor or incurred by the defendant by reason of a breach by the debtor of any warranty or covenant contained in the agreement.  The failure of the debtor to pay VR was an omission by the debtor that breached paragraph 12 and resulted in the defendant being sued by VR and incurring attorneys' fees.  To the extent reasonable, such attorneys' fees thus fall within the indemnity obligation of paragraph 21.

---

[5]Paragraph 16 of the Asset Purchase Agreement contains the following provision:

> "Each party to this Agreement otherwise agrees to pay its own fees and expenses separately incurred by each in connection with the sale and conveyance of assets hereunder."

- 22 -

(iii) Was the amount of the settlement reasonable?

Although this issue involves a hindsight evaluation of a settlement already made, such evaluation must be made based upon the circumstances that existed at the time of settlement.  Here, the issue is the reasonableness of the defendant paying $50,000 to VR in settlement of the lawsuit filed by VR.  In its lawsuit, VR sought to recover the fee claimed as a result of the Listing Agreement with the debtor.  Although various claims were alleged, the real gravamen of the suit was the recovery of the fee.  This involved a claim for a fixed amount, to wit, $48,000.[6]  While the debtor apparently did not agree to the $48,000 figure, the debtor acknowledged that the amount of the was at least $38,000, but by that time did not have the money to pay that amount.  Was it reasonable for the defendant to pay $50,000 in order to settle a claim for the $48,000 fee?  Under the circumstances of this proceeding, the court is satisfied that the answer to this question is yes.  At the time of the settlement, there was very little chance that the defendant would be able to avoid liability for the fee.  The liability that confronted the defendant under the bulk transfer statutes coincided with the debtor's liability under the Listing Agreement.  The defendant thus was liable to VR for

---

[6]Following the July 9, 2004 closing, there were discussions between the Debtor and VR regarding the amount of the amount of the fee that should be paid to VR.  During these discussions, VR agreed to accept a fee of $48,000 rather than the $50,000 minimum fee specified in the Listing Agreement.

- 23 -

whatever the debtor owed VR under the Listing Agreement. The defendant was faced with a claim of not only the principal amount of $48,000, but also a claim for interest and attorneys' fees. A recovery by VR likely would have included interest of more than $11,400 (3 years of interest at the North Carolina's 8% legal rate of interest[7]). Under the attorney fee provision of the Listing Agreement[8], VR stood to recover an attorneys' fee of as much as 15% of the award in VR's suit.[9] While it is not clear whether attorneys' fees would be recoverable under the bulk transfer statutes, the defendant faced the risk that attorneys' fees might be recovered. On top of these amounts, the defendant also was faced with paying the attorneys' fees that it would have incurred if VR's suit had gone to trial. Under these circumstances, the court finds that the $50,000 payment by the defendant was reasonable and, hence, may be utilized to effect a setoff with respect to the recovery sought by the plaintiff.

> (iv) Reasonableness of the Attorney's
>       Fees Asserted by Defendant.

The attorneys' fees asserted as a part of the defendant's claim consist primarily of the fees of the attorneys who

---

[7]See N.C. Gen. Stat. § 24-1.

[8]Under paragraph 8 of the Listing Agreement, the Debtor agreed "to reimburse BROKER for reasonable attorney's fees and all other costs and expenses incurred by BROKER in enforcing this Agreement in addition to payment of the Transaction Fee."

[9] See N.C. Gen. Stat. § 6-21.2.

represented the defendant in the two lawsuits that were brought by VR. The services of these attorneys extended from March of 2005 until September of 2007 when the litigation was settled. During that period the attorneys submitted monthly statements (DX-22) that reflect fees totaling $42,873.50 for services rendered in the two suits. The statements provide an itemization that includes the dates on which services were rendered, a description of such services, the identity of the attorney performing the services, the time spent in performing the services and the amount billed for such services. The first suit commenced by VR proceeded through discovery to the eve of trial before it was voluntarily dismissed by VR. The second suit included additional claims and involved additional discovery, a motion for summary judgment, a mediated settlement conference that was unsuccessful, trial preparations and was finally settled shortly before it was scheduled for trial. The services described in the monthly bills were reasonably necessary in order to properly handle this litigation and the amount of time expended by the attorneys in performing such services likewise was reasonable. The hourly rates charged by the two attorneys who worked on the cases were $150, which increased to $175 in June of 2006, and $250 for the senior attorney. Considering the nature of the services required in handling the VR litigation, these hourly rates were reasonable. Although substantial, the court finds that the attorneys' fees of $42,873.50 that were incurred were

reasonable and that such fees likewise may be utilized by the defendant in support of its setoff defense.

In concluding that the $50,000 settlement and the defendant's attorneys' fees were reasonable, the court has considered the plaintiff's argument that the settlement and fees were not reasonable because the defendant could have settled for a lesser amount and should have settled earlier. This argument was not accepted. To have done so would have required the court to second guess decisions made during the course of lengthy and contentious litigation without a sufficient evidentiary basis for doing so.

3.  Amount of Plaintiff's Claim.

Neither of the promissory notes issued by the defendant is a negotiable instrument. The $50,000 note provides that it was issued pursuant to the Purchase Agreement and a Consulting and Noncompetition Agreement and "is subject to the terms and conditions of the Agreements, which, by this reference, incorporated herein and made a part hereof." The Consulting and Noncompetition Agreement contains the following provision:

> In the event of a breach or threatened breach by Seller or Reynolds of any of their respective obligation under the Asset Purchase Agreement or this Agreement, the Purchaser shall have the right to suspend payments and to setoff any damages it may suffer against the obligations to Seller or Reynolds under any promissory note given to Seller or Reynolds.

The $50,000 note was payable in 36 monthly payments of $1,500 per month, beginning on January 1, 2005. The $30,000 note was due in its entirety on January 1, 2005, and also allowed the defendant to withhold payment if a default on the part of the debtor existed. By January 1, 2005, the debtor was in default with respect to its agreement to pay the broker's fee to VR. As a result, the defendant was contractually relived of the payment schedules contained in the notes and was not required to resume payments until the resolution of the VR claim. Having agreed to the suspension of the defendant's payment obligation, the debtor (and the plaintiff as successor to the debtor's rights) was not entitled to any interest prior to the resolution of VR's claim. The net result is that the plaintiff's claim is limited to the principal amounts due under the promissory notes, i.e., $80,000.

CONCLUSION

The aggregate amount that the defendant is entitled to include in its claim against the debtor and to utilize in effecting a setoff under section 553 is at least $92,873.50, consisting of the $50,000 settlement and attorneys' fees of $42,873.50. Since that amount exceeds the amount recoverable by the plaintiff under the promissory notes from the defendant, the plaintiff is entitled to no recovery from the defendant. A final judgment so providing shall be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure and Rule 9021 of the Federal Rules of Bankruptcy

Procedure.

This 3rd day of March, 2009.

_____
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

Charles M. Ivey, III, Esq.
John M. Blust, Esq.
P.O. Box 3324
Greensboro, NC 27402-3324

Amiel J. Rossabi, Esq.
P.O. Box 41027
Greensboro, NC 27404-1027

Michael D. West, Bankruptcy Administrator